IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | |
|---|---|
| MYRON D. HILL, | ) |
| | ) |
|     Plaintiff, | ) |
| | )   CIVIL ACTION NO.: |
| vs. | ) |
| | )   JURY TRIAL DEMANDED |
| SUNDT CONSTRUCTION, INC. | ) |
| | ) |
|     Defendant. | ) |

## COMPLAINT

**NOW COMES,** Plaintiff Myron D. Hill ("Plaintiff") and avers against Sundt Construction, Inc. ("Defendant") the following:

## PARTIES AND SERVICE

1. Plaintiff is Myron D. Hill, a Citizen of the United States of America and of the State of Texas, and a resident of Navarro County.

2. Defendant is Sundt Construction, Inc., an Arizona Corporation, whose registered Agent in Texas is CT Corp. System, with an address of 1999 Bryan Street, Suite 900, Dallas. TX 75201.

## JURISDICTION & VENUE

3. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1343(a)(4), because Plaintiff asserts federal civil rights claims under Title VII of the Civil Rights Act of 1964. This Court has supplemental jurisdiction over Plaintiffs' Texas state law claims pursuant to 28 U.S.C. § 1367.

4. This Court has personal jurisdiction over Defendant, as Defendant Sundt Construction Inc. regularly conducts business in this District, from its Dallas office at 8445 Freeport Parkway, Suite 240, Irving, TX 75063.

5. Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(1), as Defendant regularly conducts business in this District. Venue is also proper under 28 U.S.C. § 1391(b)(2), as a substantial part of the events or omissions giving rise to the federal and state claims herein occurred in this District.

## CONDITIONS PRECEDENT

6. All conditions precedent to jurisdiction have occurred or been complied with. A charge of discrimination was timely filed with the Texas Workforce Commission and the Equal Employment Opportunity Commission on or around September 17, 2019. Plaintiff's Complaint is filed within ninety days of Plaintiff's receipt of a right to sue letter from the Equal Employment Opportunity Commission. The right to sue letter was mailed on November 11, 2020.

## FACTUAL ALLEGATIONS

7. Plaintiff Myron Hill started working for Defendant Sundt Construction, Inc. on November 28, 2018 as a Flagger and was soon promoted to Dump Truck Driver. Plaintiff enjoyed his job and did not have any disciplinary issues.

8. On Saturday, June 29, 2019, Defendant's Scraper Operators were acting in a hostile manner toward the Dump Truck Drivers, including Plaintiff, when the Dump Truck Drivers, including Plaintiff, attempted to dump their loads in the area where the Scraper Drivers were working. The Scraper Drivers were yelling, using foul language, and being rude to the Dump Truck Drivers, including Plaintiff, who were just doing their jobs of driving in to unload their trucks.

9. Later that same day, Plaintiff spoke to his Superintendent John Eby, and suggested that Eby should say something to the Scraper Drivers during the next Monday morning meeting, about abusive behaviors and the need for mutual respect. Eby told Plaintiff that Plaintiff should speak about it himself. The weekly meeting always started by management stating that Sundt is an equal opportunity employer and does not discriminate based on race, sex, national origin, etc.

10. On Monday, July 1, 2019, as planned, Plaintiff spoke up at the meeting of about 50 employees and said that since they were all trying to do the same job, they should help and respect each other so things could go smoothly on the job.

11. After the meeting, Scraper Driver Charles Spurgeon confronted Plaintiff and asked why Plaintiff had complained about Charles's behavior. Charles was swinging his arms at Plaintiff while talking to him.

12. That same day, Charles, who had supervisory responsibility for the Scraper Drivers, was again cussing, yelling and acting erratically, swinging his arms toward the Dump Truck Drivers, including Plaintiff, every time they dumped a load.  The drivers were complaining to each other, so Plaintiff asked Jeremy, Plaintiff's Supervisor, where they should dump their loads because Charles was throwing a temper tantrum every time the Drivers dumped a load.

13. Jeremy told Plaintiff that he would talk to Charles and not to worry about it.

14. Later that day, Charles confronted Plaintiff in Plaintiff's truck and demanded to know why Plaintiff had spoken with Jeremy. Plaintiff said it was because of Charles's behavior. Plaintiff further told Charles he was not going to argue with him.

15. Later that same day, Jeremy told Plaintiff that he had talked to Charles about the situation and in response, Charles had said a lot of derogatory things about Plaintiff.

16. Jeremy would not tell Plaintiff specifically what Charles had said about Plaintiff, but Jeremy did say that Charles's language was so bad that Jeremy was trying to figure out whether he needed to talk to higher management about the situation.

17. Based on what he knew about Charles, Plaintiff suspected that Jeremy's reluctance to tell him exactly what Charles was because Charles called Plaintiff a "Nigger."

18. Plaintiff continued to press Jeremy, but Jeremy, at that point, refused to tell Plaintiff what Charles had said.

19. The next day, July 2, 2019, at 8:30 A.M., Charles asked Plaintiff's Co-worker Zack Richardson whether Plaintiff was upset about the "comments" Charles had made to Jeremy about Plaintiff. When Zack told Charles that Plaintiff was upset, Charles said, "Fuck that Nigger!" Plaintiff became more concerned that Charles was not going to stop his abusive behavior and hostile treatment of Plaintiff in addition to his concern that the company was unwilling to check Charles's behavior and vitriolic language.

20. Zach called Plaintiff and told him that Charles had used the "N-word". Zach also asked if he should tell the Supervisor. Plaintiff told Zach to do what he thought was right. Plaintiff was nervous and distraught and felt threatened by Charles's language and disrespect.

21. The same day, Zach told his Supervisor (Jeremy) what Charles said about Plaintiff including the fact that Charles had called Plaintiff a "Nigger". The incident went up the chain of command to the Project Manager and the EEO Officer Richard Olmos.

22. Everyone who was informed of the incident talked to Plaintiff about it—the Supervisor, Superintendent, the EOE officer and Project Manager. Plaintiff told each of them that he was very uncomfortable with the dynamic he was experiencing and that he should not have to

work in such a hostile environment. All the Managers agreed and promised Plaintiff that something would be done about the problem with Charles Spurgeon.

23. Later that week on two different occasions the EOE Officer Richard Olmos pulled Plaintiff out of Plaintiff's truck and told him something would be done about Charles's behavior.

24. Each day, the Sundt crew started work early before dark. Every morning, Plaintiff felt like he had to keep his eye on Charles and Charles's immediate group of Co-workers. Plaintiff was worried that there might be a physical altercation.

25. Plaintiff was moved across the road to work in another area and encountered another White Bulldozer Driver who also indicated he used the word "Nigger" in reference to African Americans. Plaintiff told Zeke, the Safety Officer, about this.

26. Nothing was done about Charles's foul and threatening language or the hostile work environment that Plaintiff was experiencing. Charles's brother Chris was Charles' supervisor, and Chris made it generally known that if Charles got fired for calling Plaintiff a "Nigger," he would quit too. Jeremy told Plaintiff this. Plaintiff knew that no effective action would be taken against Charles and Chris because their roles were seen as indispensable to the job.

27. Plaintiff was aware that the job market for his field was very unstable, and he needed his job so he could take care of his family. But, every day on the job site, Plaintiff was worried about Charles and possible retaliation by Charles against him.

28. Plaintiff waited for someone to tell him what was going to be done about the hostile work situation. Finally, Plaintiff decided to ask again because he was becoming more and more stressed every day about Charles's behavior and Plaintiff's work environment because now other White employees were treating Plaintiff in a negative and hostile way.

29. The White employees who worked with Charles stopped speaking to Plaintiff which made it difficult for work to go smoothly.

30. On July 30, 2019, Plaintiff asked Superintendent John Eby if they cared enough about him to update him on the situation. John Eby directed Plaintiff to the EOE officer and the project manager, indicating that he had nothing more to do with the problem.

31. On August 2, 2019, Plaintiff told the EOE Officer that he was stressed out because no one had told him anything about a resolution concerning what Charles had said about Plaintiff and how Charles had been acting toward Plaintiff.

32. On or about August 2 or 3, 2019, the EOE Officer, in the area inside the construction trailer, but not in an actual office, tried to talk to Plaintiff about the problem with Charles Spurgeon.

33. Because other employees could easily overhear the conversation, Plaintiff asked the EOE Officer if they could speak inside the EOE Office.

34. The EOE Officer then told Plaintiff that Charles had received a write up. Plaintiff still felt uncomfortable, though, because he felt this was not enough to resolve the hostile work environment he was experiencing. Plaintiff knew that Company policy was that an employee could be terminated after three write ups.

35. But to Plaintiff, Charles had already called him "Nigger" numerous times, without consequence, so what good was one write-up? On the write-up, Charles' signature appears to be in Richard's handwriting. Upon information and belief, Richard Olmos never spoke with Charles about the problem and signed Charles's name on the Corrective Action Notice.

36. Jeremy, Plaintiff's supervisor, asked Plaintiff if anything had been done, and Plaintiff said Richard had told Plaintiff that Charles had received a write-up. Plaintiff asked Jeremy

if Jeremy had told management everything that had happened that day Plaintiff first complained about Charles' behavior. Jeremy confessed that when he had spoken to Charles that day, Charles had used the "N-word" in reference to Plaintiff.

37. During the time Plaintiff was waiting for a resolution to his problem with Charles, a Hispanic male employee tried to get a date with a White woman coworker. The woman told her supervisor about it, and the Hispanic man was fired on the spot.

38. This showed systemic intersectional bias in that the Defendant would treat a White woman more fairly than a Black man. Both employees were put in an uncomfortable situation by a coworker, but immediate action was taken for the White woman, but no action was taken on Plaintiff's behalf.

39. On August 13, 2019, Plaintiff, Charles, and three other male employees were given a random mouth swab drug test by the Safety Officer, Zeke. The odds of Plaintiff and Charles both being called for a random drug test at the same time were very long.

40. Plaintiff believes this test was Sundt's further discriminating against him, as well as a way for the Company to set up a pretext to fire Plaintiff by tampering with a drug test.

41. Plaintiff has never used any marijuana product of any kind.

42. While Plaintiff was taking his test, the swab came off the stick. The Safety Officer, rather than giving Plaintiff a new swab stick, instructed him to just put the swab back on the stick.

43. On Monday, August 19, 2019, Dr. Weil, the Company Physician, based in Tempe, Arizona, called Plaintiff and the call went through to voicemail.

44. Plaintiff tried several times to call Dr. Weil back, until 5:00 P.M., but was unsuccessful in reaching the doctor.

45. The next day, Tuesday, the Safety Officer told Plaintiff to call Mary Brown in the Human Resources Office at the Company Headquarters.

46. When Plaintiff called her, Mary informed Plaintiff that he had tested positive for marijuana and was going to be terminated.

47. Plaintiff finally reached Dr. Weil and Dr. Weil asked him if he used marijuana, or was around somebody who used marijuana, and Plaintiff said, "Absolutely not."

48. Plaintiff asked both Dr. Weil and Mary Brown if he could re-test. They refused to allow him to take another test.

49. The next day, Wednesday, August 21, 2019, Plaintiff paid for his own drug test in Corsicana, Texas. The results were negative for controlled substances including marijuana.

50. The next day, Thursday, August 22, 2019, Plaintiff returned to the yard and showed his negative results to the Safety Officer, Zeke and the company secretary. He was informed that there was nothing that could be done about his termination.

51. Many Sundt employees were upset about the treatment Plaintiff had received and said they would be witnesses for him, but then they told Plaintiff they were afraid of losing their jobs.

52. Later that week Plaintiff took a drug test for a new job and passed. On September 9, 2019, Plaintiff took a hair follicle test and passed.

53. Plaintiff started the new job, but soon after, his car broke down and the new job was an hour from his home. Plaintiff could not get to work and had to quit in December 2019 and has been unemployed since. The Sundt Construction job was five minutes away from Plaintiff's home so transportation to work was never an issue when he worked for Sundt.

54. After Plaintiff was fired, Jeremy told other Sundt employees that he wanted to run Plaintiff over with his truck.

55. Section 5.03 (A)(1) ("Drug and Alcohol Testing") of the Sundt Drug and Alcohol Free Safe Workplace Policy states: "Any drug or alcohol test that yields an initial positive result will be confirmed using a different test method than was used in the initial test." After Defendant declared Plaintiff was positive for marijuana, he was never drug tested again using a different test method. This was a violation of Defendant's Policy.

56. Plaintiff was unlawfully terminated from his job by Defendant, on the basis of his race, and in retaliation for the protected activity he engaged in, to try to rectify the hostile work environment he was experiencing.

**RESPONDEAT SUPERIOR AND RATIFICATION**

57. Whenever in this Complaint it is alleged that Defendant, Sundt Construction, Inc. did any act or thing, it is meant that the Defendant's officers, agents, servants, employees or representatives did such act and/or that at that time such act was done, it was done wit the full authorization or ratification of the Defendant or was done in the normal and routine course and scope of employment of Defendant's officers, agents, servants, employees, or representatives.

**COUNT ONE - DISPARATE TREATMENT - WRONGFUL TERMINATION-
VIOLATION OF TITLE VII**

58. All preceding paragraphs are incorporated herein as if fully set forth.

59. Plaintiff is a member of a protected class; he was qualified for his position as Dump Truck Driver; he was the subject of an adverse employment action, namely being terminated without just cause on the basis of race; he was treated less favorably than were other similarly situated employees, who were not members of a protected class, under nearly identical circumstances. Plaintiff has been damaged as the result of these actions.

60. Plaintiff is an African American, Black man; he did not receive any negative write-ups for his work; he was terminated for the false and pre-textual reason of failing a drug test and was not retested according to company policy; white employees were treated more fairly than he was; and Plaintiff suffered the loss of his job and benefits.

## COUNT TWO - HOSTILE WORK ENVIRONMENT

61. All preceding paragraphs are incorporated herein as if fully set forth.

62. Plaintiff was subjected to unwelcome harassment on his job; the harassment was based on Plaintiff's race; the pervasive harassment affected a term, condition, or privilege of Plaintiff's employment; and Defendant knew or should have known of the harassment and failed to take prompt and effective remedial action, and Plaintiff was damaged as the result.

63. Plaintiff was harangued and repeatedly called "nigger" by Charles Spurgeon; the word "nigger" is a derogatory, racist term used against people who are black/African Americans; the harassment was so pervasive that other employees fretted about what to do about it; after Plaintiff complained of the treatment, he was retaliated against through false results on a drug test; Sundt knew of the actions of Charles Spurgeon but failed to take prompt, effective remedial action. Plaintiff suffered the loss of his job as a result of the actions of Charles Spurgeon and Sundt.

## COUNT THREE - RETALIATION

64. All preceding paragraphs are incorporated herein as if fully set forth.

65. Plaintiff engaged in activity protected by Title VII, namely trying to rectify what was an extremely hostile work environment; Defendant took adverse employment actions against Plaintiff by drug testing then firing Plaintiff; and a causal connection exists between that protected activity and the adverse employment action.

## COUNT FOUR - VIOLATION OF TEXAS LABOR CODE 21.051

66. All preceding paragraphs are incorporated herein as if fully set forth.

67. Defendant subjected Plaintiff to a hostile work environment based on pervasive harassment of Plaintiff by Co-Workers and management, on the basis of Plaintiff's race; Plaintiff worked through channels to attempt to resolve the hostile work environment he was experiencing; Defendant retaliated by drug testing then firing Plaintiff based on a false positive test, without providing a test by an alternate method as required by written Company Policy; Defendant has segregated Plaintiff in a manner that deprives Plaintiff of his opportunity to work in a job he was qualified for, and has affected his status as an employed person; Plaintiff continues to suffer as the result of all the above actions of Defendant.

## COUNT FIVE - INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

68. All preceding paragraphs are incorporated herein as if fully set forth.

69. Defendant Sundt Construction, Inc. acted intentionally and recklessly; Defendant's conduct was extreme and outrageous; Defendant's conduct caused Plaintiff emotional distress; the emotional distress suffered by Plaintiff was severe.

## DAMAGES

a. All reasonable and necessary Attorney's fees incurred by or on behalf of Plaintiff;

b. Back pay from the date that Plaintiff was released to return to work with restrictions, and interest on the back pay in an amount to compensate Plaintiff as the Court deems equitable and just;

c. All reasonable and necessary costs incurred in pursuit of this suit;

d. Emotional pain;

e. Expert fees as the Court deems appropriate;

 f. Front pay in an amount the Court deems equitable and just to make plaintiff whole;

 g. Prejudgment interest;

 h. Loss of enjoyment of life;

 i. Mental anguish in the past;

 j. Mental anguish in the future;

 k. Loss of earnings in the past;

 l. Loss of earning capacity which will, in all probability, be incurred in the future; and

 m. Loss of benefits.

## EXEMPLARY DAMAGES

Plaintiff would further show that the acts and omissions of Defendant complained of herein were committed with malice or reckless indifference to the protected rights of the Plaintiff. In order to punish said Defendant for engaging in unlawful business practices and to deter such actions and/or omissions in the future, Plaintiff also seeks recovery from Defendant for exemplary damages.

## PRAYER

**WHEREFORE, PREMISES CONSIDERED**, Plaintiff Myron D. Hill respectfully prays that the Defendant be cited to appear and answer herein, and that upon a final hearing of the cause, judgment be entered for the Plaintiff against Defendant for damages in an amount within the jurisdictional limits of the Court; exemplary damages, together with interest as allowed by law; costs of court; and such other and further relief to which the Plaintiff may be entitled at law or in equity.

Date: December 30, 2020

                 Respectfully submitted,

By: /s/ Renea Overstreet
Renea Overstreet
Texas Bar No. 24066704
E-Mail: rdolaw@gmail.com
2100 N. Main Street, Suite 228
Fort Worth, Texas 76164
Tel. (817) 810-9747
Fax. (1-855) 299-5593
Attorney for Plaintiff
Myron D. Hill
